# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### NORTHERN DIVISION
#### AT COVINGTON

CIVIL ACTION NO. 16-49-DLB-CJS

DOLORES JANE BODEN, et al.                                              PLAINTIFFS


v.                        **MEMORANDUM OPINION AND ORDER**


ST. ELIZABETH MEDICAL CENTER, INC., et al.                      DEFENDANTS

\* \*  \* \*  \* \*  \* \*  \* \*  \* \*  \* \*  \* \*

This matter is before the Court on cross-Motions for Summary Judgment (Docs. # 129 and 130) pursuant to the Court's October 9, 2018 Order (Doc. # 123). The Motions address the question of whether St. Elizabeth Medical Center's at-issue defined-benefit plan is a "church plan" and therefore exempt from the requirements of the Employee Retirement Income Security Act of 1974 (ERISA). (Docs. # 129 and 130). The Court having heard oral argument and reviewed the Motions, accompanying briefing, and available record evidence, has determined that the at-issue plan is a "church plan" and is exempt from ERISA. Accordingly, for the following reasons, Defendants' Motion for Partial Summary Judgment (Doc. # 129) is **granted** and Plaintiffs' Motion for Summary Judgment (Doc. # 130) is **denied**. Further, as the Court has determined that ERISA does not apply and must dismiss the ERISA claims—the only claims over which the Court has original jurisdiction—it also will dismiss the pending state-law claims pursuant to 28 U.S.C. § 1367(c)(3).

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Dolores Jane Boden, Jeanine Godsey, and Patricia Schafer ("Plaintiffs") previously worked as nurses at St. Elizabeth Medical Center ("St. Elizabeth"), a nonprofit corporation with its headquarters in Edgewood, Kentucky.  (Doc. # 74 at 4-5).  St. Elizabeth provides health care in Kentucky, Ohio, and Indiana.  *Id.* at 5. St. Elizabeth funds a defined-benefit pension plan, which "promises [its] participants a retirement income that is based on their income and length of service."  *Id.* at 1-2.  Each of the Plaintiffs is a participant in the St. Elizabeth Medical Center Employees' Pension Plan (the "Plan").  *Id.* at 4-5.

The Plan, first established in 1966 and funded by St. Elizabeth, provides monthly pension benefits to retired St. Elizabeth employees.  *Id.* at 10.  The assets which make up the Plan are held in a trust, and benefits are paid from the trust to the Plan participants. *Id.*  On February 23, 2016, the President and CEO of St. Elizabeth, Garren Colvin, and the Senior Vice President and Chief Clinical Integration Officer, Dr. Robert Prichard, informed Plan participants in a letter that "[a]s of December 31, 2015, the [St. Elizabeth Plan] was 59% funded."  *Id.* at 2; *see also* (Doc. # 74-1) (letter from Garren Colvin and Robert Prichard to Plan participants).[1]

In light of this information, the Plaintiffs filed this putative class action suit alleging, *inter alia*, violations of ERISA by St. Elizabeth, St. Elizabeth Medical Center Employees' Pension Plan Administrative Committee, and several named and unnamed individuals involved in the administration of the Plan ("initial Defendants").  The initial Defendants argued that St. Elizabeth was not required to follow the provisions of ERISA because it

---

[1]    One year later, as of December 31, 2016 and after the initiation of this litigation, the Plan was 66% funded.  (Doc. # 74 at 2) (Amended Complaint citing Saint Elizabeth Medical Center, Inc.'s 2016 Financial Statements at 51).

was considered a church, and therefore fell under ERISA's church-plan exemption. (Doc. # 21). The Court initially stayed this case pending the Supreme Court's resolution of *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652 (2017), a case dealing with the exemption for churches provided by ERISA. (Doc. # 60).

Following the Supreme Court's decision in *Stapleton*, the Court allowed Plaintiffs to file an Amended Complaint. (Doc. # 71). The Amended Complaint brings claims, including a request for declaratory judgment, against St. Elizabeth as well as current and former members of the St. Elizabeth Medical Center Employees' Pension Plan Administrative Committee ("the Committee")—collectively, the "Defendants"—for violations of ERISA and Kentucky state law. (Doc. # 74). The Committee, created by the St. Elizabeth Board of Trustees ("the Board"), is the Plan's fiduciary. *Id.* at 5. Defendants answered the Amended Complaint and brought a declaratory-judgment counterclaim, seeking a declaration that the Plan is a church plan under ERISA. (Doc. # 76).

The Defendants then filed a Motion to Dismiss the former members of the Committee from the case (Doc. # 77) and the Plaintiffs filed a Motion to Dismiss the Defendants' declaratory-judgment counterclaim (Doc. # 81). The Court granted in part and denied in part the Defendants' Motion to Dismiss and granted the Plaintiffs' Motion to Dismiss on April 4, 2018. (Doc. # 100). The Defendants then filed a Motion for Reconsideration of the April 4, 2018 Order, which the Court also denied. (Docs. # 102 and 120). Thereafter, the Court convened a telephonic conference on October 9, 2018 to discuss the need for further discovery and a pending summary-judgment Motion. (Doc. # 123). During that conference, the Court ordered that the Defendants' renewed Motion for Summary Judgment (Doc. # 115) be denied without prejudice, that the Plaintiffs'

request for discovery be granted in part, and that cross-motions for summary judgment on the church-plan issue be filed by January 9, 2019.  (Doc. # 123).

Motions for Summary Judgment (Docs. # 129 and 130) were timely filed pursuant to the Court's Order.  (Doc. # 123).  Following two extensions of time for briefing (Docs. # 135 and 141) and an Order allowing the filing of a sur-reply and sur-sur-reply (Doc. # 146), briefing of both Motions was completed.  (Docs. # 137, 139, 142, 143, 147 and 148). Those Motions became ripe for the Court's review after oral argument on July 19, 2019 before the undersigned.

## II.     ANALYSIS

### A.      Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In adjudicating a summary-judgment motion, the judge must not weigh the evidence before the Court, but merely determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249.  Speculation is insufficient to defeat summary judgment.  *Bradley v. Wal-Mart Stores East, LP*, 587 F. App'x 863, 866 (6th Cir. 2014).  Rather, sufficient evidence, more than a "mere scintilla," from which a jury could draw a conclusion in favor of the nonmoving party must be shown. *Anderson*, 477 U.S. at 252.

"[T]he standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *U.S. S.E.C. v. Sierra Brokerage Servs.*, 712 F.3d 321, 327 (6th Cir. 2013) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). "[T]he court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co.*, 929 F.2d at 248 (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

### B.    Church-Plan Issue

Congress passed ERISA in 1974 to "remedy certain defects in the private retirement system which limit the effectiveness of the system in providing retirement income security." H.R. REP. NO. 93-533, at 4639 (1973); *see also* 29 U.S.C. § 1001. Recognizing the growth of private pensions and the limited regulation of the system, the legislation aimed to "establish minimum standards of vesting, funding, and fiduciary and a system of compulsory benefit insurance to protect the security of pension rights." H.R. REP. NO. 93-533, at 4643. The statute generally applies to employee-benefit plans, but exempts certain plans, including "governmental plan[s]" and "church plan[s]". 29 U.S.C. § 1003. At issue in these summary-judgment Motions is whether the employee-benefit plan provided for employees of St. Elizabeth is a church plan and thus not subject to the provisions of ERISA. (Docs. # 129-1 at 1 and 131 at 6).

### *1.    The Statutory Language*

Under ERISA, for purposes of the church-plan exemption:

A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches [a church plan] *includes a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan*

*or program for the provision of retirement benefits or welfare benefits*, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.

29 U.S.C. § 1002(33)(C)(i) (emphasis added). In other words, this provision—"a mouthful for lawyers and nonlawyers alike" according to the Supreme Court—means that a church plan falls into the ERISA exemption if the plan is established and maintained by a church or association of churches *or* maintained by an organization with the principal purpose of administering or funding the plan. *Stapleton,* 137 S. Ct. at 1656; 29 U.S.C. § 1002(33)(C)(i)*.* The latter has been referred to by the Supreme Court as a "principal-purpose organization." *Stapleton,* 137 S. Ct. at 1656. Defendants argue that the at-issue Committee is such a principal-purpose organization; they do not seem to argue that St. Elizabeth or the Committee is a "church or . . . a convention or association of churches" under subsection (33)(C)(i). *See* (Doc. # 129-1 at 8).

This principal-purpose organization statutory language has been distilled into a three-part test, which other courts[2] have used to determine whether a plan maintained by a principal-purpose organization falls within the church-plan exemption:

1. Is the entity a tax-exempt nonprofit organization associated with a church?

2. If so, is the entity's retirement plan maintained by a principal-purpose organization? That is, is the plan maintained by an organization whose principal purpose is administering or funding a retirement plan for entity employees?

3. If so, is that principal-purpose organization itself associated with a church?

---

[2]    There is a dearth of Sixth Circuit case law regarding the church-plan exemption, so the Court looks to the few relevant cases from other districts and circuits. *See infra.*

*Medina v. Catholic Health Initiatives (Medina I)*, 877 F.3d 1213, 1222 (10th Cir. 2017); *see also Smith v. OSF Healthcare Sys.*, 349 F. Supp. 3d 733, 740 (S.D. Ill. 2018) (appeal pending); *Rollins v. Dignity Health*, 338 F. Supp. 3d 1025, 1035 (N.D. Cal. 2018). A plan that satisfies each prong falls within the church-plan exemption.

### 2. Inquiry 1—Is the entity associated with a church?

The Court must first determine whether the entity "whose employees the plan benefits [is a tax-exempt nonprofit] associated with a church." *Medina I*, 877 F.3d at 1222. Pursuant to ERISA, "[a]n organization, whether a civil law corporation or otherwise is associated with a church or a convention or association of churches if it shares common religious bonds and convictions with that church or convention or association of churches." 29 U.S.C. § 1002(33)(C)(iv). Courts consider a number of factors in determining whether an organization—particularly a healthcare organization—is associated with a church, including: a church's recognition of the organization; the inclusion of language in key documents that evidences a relationship between the organization and a church; denominational requirements for board members, employees, or patients; clear affiliation with a church through denominational chapels; evidence that the organization is guided by a specific church's religious principles; and requirements that certain decisions must be approved by a church's leadership (*e.g.* the Holy See), among other things. *See Medina I* at 1222-23 (rejecting the factors elucidated in *Lown v. Continental Casualty Co.*, 238 F.3d 543 (4th Cir. 2001), because the narrow factors did not reflect "the broad language" of the church-plan exemption and instead considering a variety of facts indicating a relationship between the Catholic Health Initiatives and the

Catholic Church); *see also Smith*, 349 F. Supp. 3d at 741; *Rollins*, 338 F. Supp. 3d at 1038; *Sanzone v. Mercy Health*, 326 F. Supp. 3d 795, 806-07 (E.D. Mo. 2018).

The first portion of the three-part inquiry is satisfied here. The relevant entity in this case is St. Elizabeth, as the Plan was developed to provide retirement benefits to St. Elizabeth employees. (Doc. # 132-3 at 5-6) (indicating that "it is the intention of the Employer [St. Elizabeth] to continue to maintain a defined benefit plan for the sole and exclusive benefit of its eligible Employees"). St. Elizabeth is a tax-exempt nonprofit entity. (Doc. # 74 at 5) (conceding that St. Elizabeth is a 501(c)(3) nonprofit corporation); *see also* (Doc. # 63 at 1-2) (Affidavit of CEO Garren Colvin explaining that St. Elizabeth is a tax-exempt nonprofit). The Court now must determine if there is a genuine issue of material fact as to whether St. Elizabeth is associated with a church. The Court finds that there is no question that St. Elizabeth is associated with the Catholic Church.

Defendants identify several ways in which St. Elizabeth is associated with the Catholic Church.[3] (Doc. # 129-1 at 10-20). St. Elizabeth was founded in 1861 by Franciscan Sisters of the Poor and the property was acquired "in the name of this Catholic religious order." *Id.* at 11; *see also* (Doc. # 20-3). Sponsorship of St. Elizabeth was transferred to the Diocese of Covington in 1973, (Doc # 63-2), and continues to this day; this is evidenced, for example, by the fact that the Bishop of Covington is the only person with "the authority to dispose of . . . hospital properties upon dissolution of St. Elizabeth." (Doc # 129-1 at 11-12). Beyond this, St. Elizabeth is listed in the Official Catholic Directory. (Doc. # 63-8).

---

[3]    The following is not an exhaustive list of that which Defendants identify.

Moreover, the governing documents of St. Elizabeth give the Bishop of Covington control over aspects of St. Elizabeth's operations and indicate clear association with the Catholic Church. (Doc. # 63-4) (Bylaws of St. Elizabeth which require the Bishop's approval over certain aspects of governance); *see also* (Doc # 129-1 at 12-15). For example, the Bishop approves or rejects Board member candidates. (Doc. # 62-5) (letter from the Bishop of Covington to the Chair of the St. Elizabeth Board of Trustees approving two prospective members and rejecting a third prospective member); *see also* (Doc. # 129-1 at 13-14). The governing documents, including the Articles of Incorporation, also generally indicate St. Elizabeth's affiliation with the Catholic Church. (Doc. # 63-1) ("The corporation is a Roman Catholic health organization and, as such, will at all times uphold, embrace and be subject to the traditions, teachings and Canon Law of the Roman Catholic Church, the spirit and traditions of its Sponsor, and the Ethical and Religious Directives for Catholic Health Care Services promulgated by the National Conference of Catholic Bishops, as they may be amended from time to time."); *see also* (Docs. # 63-3 and 63-4) (Bylaws of St. Elizabeth). Documents, including literature provided to patients, also indicate that the hospital is required to follow the Ethical and Religious Directives for Catholic Health Care Services. *See, e.g.*, (Doc. # 63-7). The Directives are kept at each nurses' station. (Doc. # 64 at 5) (affidavit of St. Elizabeth Vice President of Mission and Pastoral Care).

Additionally, St. Elizabeth employs priests that "visit patients to administer the Catholic sacrament of the anointing of the sick and to dispense the Holy Eucharist" and maintains Catholic chapels at four of its facilities. (Doc # 129-1 at 17-18); *see also* (Doc. # 64 at 3). Mass is conducted at the chapels throughout the week. (Doc. # 64 at 3-4);

*see also* (Doc # 129-1 at 18). There are crucifixes in most rooms (including "every patient room, meeting room and chapel at St. Elizabeth") and a prayer is broadcast throughout the hospitals every morning and evening. (Doc. # 64 at 5-6); *see also* (Doc # 129-1 at 19).

Defendants argue that this, among other evidence, is sufficient to find that St. Elizabeth is associated with the Catholic Church. The Court agrees. Like the Catholic Health Initiative in *Medina*, Mercy Health in *Sanzone*, and OSF Healthcare in *Smith*, which were all found to be associated with the Catholic Church, St. Elizabeth's Articles of Incorporation indicate its relationship with the Catholic Church and St. Elizabeth's is listed in the Official Catholic Directory. *Medina I*, 877 F.3d at 1222-23 (noting these factors, among others, indicate that the at-issue healthcare organization is associated with the Catholic Church); *Smith*, 349 F. Supp. 3d at 741 (same); *Sanzone*, 326 F. Supp. 3d at 806-07 (same). Moreover, the Defendants have presented a myriad of undisputed evidence demonstrating the connection between St. Elizabeth and the Catholic Church.[4] *See supra.* Considering the evidence put forth as a whole, including the role the Catholic Church plays in guiding St. Elizabeth's work, the control the Bishop has over certain decisions, and the integration of Catholicism into the day-to-day operations of the facilities, the Court finds that there is no dispute of material fact that St. Elizabeth is associated with the Catholic Church.

---

[4] The Plaintiffs do not appear to dispute the facts underlying Defendants' argument, nor Defendants' ultimate conclusion that St. Elizabeth is associated with the Catholic Church. *See* (Doc. # 137) (Response to Defendants' Motion for Partial Summary Judgment which does not appear to include an argument in opposition to this point).

### 3. *Inquiry 2—Is the plan maintained by a principal-purpose organization?*

Next the Court turns to the question of whether the Committee maintains the Plan, and whether the Committee is considered a principal-purpose organization under the terms of ERISA. Defendants argue generally that the Committee, along with St. Elizabeth, "maintains" the plan and is a principal-purpose organization. *See* (Docs. # 129-1 at 33, 35-37 and 139 at 16-17). Plaintiffs alternatively assert that the Committee is not an "organization," that only one organization may "maintain" the Plan, and that the Committee does not "maintain" the Plan but even if it did the Committee does not "administer" the Plan so it cannot be a principal-purpose organization. (Doc. # 132 at 20-28). The Court will address each disputed issue in turn—each issue is a hurdle, and each hurdle must be surpassed in order for the second prong of the *Medina* test to be satisfied. *Medina I*, 877 F.3d at 1222.

### a. Whether the Committee is an organization

Plaintiffs suggest that the Committee cannot be a principal-purpose organization because it is not, by definition, an "organization."[5] (Doc. # 131 at 21-22). Rather, they seem to suggest that the Committee, one of multiple "internal committees whose

---

[5] Defendants clarified an argument made in their briefing during oral argument; Defendants explained that the Plaintiffs effectively admitted the Committee is an organization by including the Committee as a named Defendant in the original Complaint and "charging [the Committee and its members] with maladministration, mismanagement and breach of fiduciary duty." Doc. # 129-1 at 5-6. The Amended Complaint does not bring claims against the Administrative Committee, rather only the individual members of the Committee. *Id.* at 7; *see also* (Doc. # 74) (Amended Complaint).

"Where a pleading has been amended or superseded by another pleading, it is necessary that a party offer in evidence the original or superseded pleading if he desires to make sure of an admission therein contained." *Shell v. Parrish*, 448 F.2d 528, 530 (6th Cir. 1971) (indicating that "[w]hile we have on one occasion on appeal taken judicial notice of a superseded pleading . . . we think the better rule is against such practice"). Accordingly, the Court will not consider any alleged admissions in the original Complaint unless the Complaint is entered into evidence. Regardless, as the Court finds the Committee to be an organization, *see infra*, Defendants' argument is moot.

members are appointed and removed by the Board," *id.* at 21, is "part of the Board under Kentucky law." (Doc. # 74 at 15). Plaintiffs suggest that the Committee is not an "organization" because it "does not create a separate entity or relieve the Board from its ultimate responsibilities." *Id.* at 21. Though the Plaintiffs fail to explain or provide support for this claim,[6] they seem to advocate that an entity, in order to qualify as an "organization," must be completely separate from any other entity.[7] *Id.* at 21-22. The Court finds this suggestion lacks merit.

ERISA does not define "organization" on its own. *See* 29 U.S.C. § 1002 (defining "employee organization" but not "organization"). "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). Often this means looking to dictionary definitions. *See id.* at 229. Black's Law Dictionary defines an "organization" as "[a] group that has formed for a particular purpose." *Organization*, BLACK'S LAW DICTIONARY (11th ed. 2019). Similarly, the Oxford English Dictionary defines an organization as "[a]n organized body of people with a particular purpose, as a business, government department, charity, etc." *Organization*, OXFORD ENGLISH DICTIONARY (3d ed. 2004). Both definitions merely require (1) a group of people with (2) a specific purpose; nothing further is necessary for a group to be considered an "organization" under an ordinary understanding. Neither definition requires an "organization" to have, or not have, a relationship with another entity. Thus,

---

[6]     The statutes Plaintiffs rely upon involve board structure in Kentucky, not the definition of an organization. Additionally, the language purportedly quoted from Ky. Rev. Stat. § 273.221 does not appear in the subsection of that statute.

[7]     The remaining section of the Plaintiff's brief regarding this argument appears to conflate the definition of "organization" and the definition of a "principal-purpose organization." *Id.* The Court will address the latter *infra*; at issue here is the definition of "organization" and whether the Committee meets that definition.

the Plaintiff's suggestion that an "organization" must be a completely separate entity is not supported by the plain meaning of "organization."

The Court finds that the Committee meets the two requirements necessary for an entity to be an "organization" within the scope of the ERISA exemption. The Plan document indicates that "[t]he Board shall appoint an Administrative Committee to manage and administer the plan. The Committee shall be the plan administrator and the named fiduciary of the plan." (Doc. # 132-3 at 41). The plain language of the Plan indicates that the Committee is a group of people with a particular purpose—administering the Plan and serving as the named fiduciary of the plan—and therefore the Court finds that, as a matter of law, the Committee is an "organization" for purposes of ERISA. Other courts considering this issue and using similar definitions of "organization" have found internal-benefits committees to be "organizations." *Medina I*, 877 F.3d at 1226; *Smith*, 349 F. Supp. 3d at 742; *Sanzone*, 326 F. Supp. 3d at 805-06. Accordingly, the Court will consider the Committee to be an "organization" for purposes of further analysis.

### b. Whether the Committee maintains the Plan

Turning to the text of the church-plan exemption in the ERISA statute, the Court must determine if the Committee is an organization that "maintains" the Plan. 29 U.S.C. § 1002(33)(C)(i). Recognizing that the reasoning of *Stapleton* does not apply to this case[8]

---

[8]      The Supreme Court was crystal clear in *Stapleton* that the case was not intended to provide any guidance as to whether an internal-benefits committee, like the one here, can qualify as a principal-purpose organization. 137 S. Ct. at 1657-58 nn. 2-3. In fact, the Court explicitly noted in two footnotes that "issues [of whether internal-benefits committees are principal-purpose organizations] are not before us, and nothing we say in this opinion expresses a view of how they should be resolved" and "the scope of [principal-purpose organizations]—and whether it comprehends the hospitals' internal benefits committees—is not at issue here." *Id.* For that reason, that Court declines to rely on any of the dicta and reasoning elucidated in *Stapleton* in resolving the issues presently before it.

and that there is no on-point precedent from the Sixth Circuit or district courts within it, the Court looks to the limited case law from other federal jurisdictions to resolve this question.

As ERISA does not define the word "maintain," the Court again must consider the "ordinary or natural meaning" of the word. *Smith*, 508 U.S. at 228. Black's Law Dictionary defines "maintain" in several ways, the most relevant of which are "[t]o continue (something)" and "to care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep." *Maintain*, BLACK'S LAW DICTIONARY (11th ed. 2019). The most relevant Merriam-Webster definition of "maintain" is similar: "to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline." *Maintain*, MERRIAM-WEBSTER (June 20, 2019, 1:56 PM), https://www.merriam-webster.com/dictionary/maintain. Other courts have used comparable definitions of "maintain," *see, e.g.*, *Medina I*, 877 F.3d at 1225; *Smith*, 349 F. Supp. 3d at 742-43, and have found the determination of whether an entity "maintains" a plan to be a fact-intensive inquiry in this context.[9] *Sheedy v. Adventist Health Sys. Sunbelt Healthcare Corp.*, No. 6:16-cv-1893-Orl-31GJK, 2018 WL 3538441, at *3 (M.D. Fla. July 23, 2018).

Beyond its plain meaning, the language and structure of the ERISA statute appear to shine additional light on the meaning of "maintained" in the church-plan-exemption context. Specifically, the language of the statute suggests that "maintained" must mean more than either "administered" or "funded." *Rollins*, 338 F. Supp. 3d at 1036. "If Congress had not intended to attach any significance to the word 'maintained,' it could have simply required that a plan be 'administered or funded' by a principal-purpose

---

[9] The Court "take[s] no position today on what 'maintain' might mean in other provisions of ERISA, where context may present a different answer." *Medina I*, 877 F.3d at 1226 n.4.

organization, and not also 'maintained' by one.   It did not make that choice."   *Id*.   If "maintained" has no independent significance, its presence in the statute would be "mere surplusage" and would violate a "well-settled principle of statutory construction."   *Id.* (internal quotations omitted).

While maintenance must be more than either administration or funding, case law suggests that to "maintain" a plan does not require the ability to amend or terminate the plan.   *Medina I*, 877 F.3d at 1225; *Sanzone*, 326 F. Supp. 3d at 803.   Rather, an organization said to "maintain" a plan must merely "care[] for the plan for the purposes of operational productivity."   *Medina I*, 877 F.3d at 1226 (quoting BLACK'S LAW DICTIONARY 1039 (9th ed. 2009)).   Moreover, in determining whether an organization is the one "maintaining" a plan, courts look to the documents governing the pension plans for guidance and focus on the responsibilities designated to the organization rather than the day-to-day functions of the organization. *See infra*.

The court in *Medina* found that when responsibility for plan "maintenance" is specifically delegated to an organization, that organization can be said to "maintain" the plan.   *Medina I*, 877 F.3d at 1226.   In support of this conclusion, the Tenth Circuit quotes the record before it; "[t]he HR Committee of the Board of Stewardship Trustees of [Catholic Health Initiatives] has primary responsibility for "maintenance" and compliance under the Plan and has fully and completely delegated those responsibilities to [the Subcommittee]" and "[t]he purpose of the [Subcommittee] shall be to provide for the proper operation, administration and maintenance of the plan."   *Id*.   Further, this Court's review of the plan document for the Catholic Health Initiatives plan at issue in *Medina* indicates that the Retirement Committee, referred to in the document as the Plan

Administrator and presumably the "subcommittee" referred to by the Tenth Circuit, has many powers and duties, including: making rules for the plan, interpreting the plan, determining benefits under the plan, and delegating "any of its responsibilities to other persons," among other things. Catholic Health Initiatives Retirement Plan, *Medina v. Catholic Health Initiatives (Medina II)*, 147 F. Supp. 3d 1190 (D. Colo. 2015), ECF No. 303-1 at 47.

In *Sanzone*, the court also looked to the plan documents to determine whether the relevant committee "maintained" the hospital's employee-benefits plan. 326 F. Supp. 3d at 804. First, the court acknowledged the list of the committee's duties included in the complaint, but also looked at what responsibilities the "Plan . . . directs the Benefits Committee to . . . engage in." *Id.* For example, the plan document indicated that the committee is to, *inter alia*, "engage in claims administration and communicate with members about plan coverage . . . comply with all reporting and disclosure requirements . . . and inspect and audit the Trustee's records." *Id.*; *see also* Mercy Health MyRetirement Personal Pension Account Plan, *Sanzone*, 326 F. Supp. 3d 795, ECF No. 150-8. The *Sanzone* court also specifically highlighted that the Mercy Health plan document included a provision that the decisions of the committee are "final, conclusive, and binding." *Sanzone*, 326 F. Supp. 3d at 804. Additionally, this Court's review of the plan document found that the relevant committee is also permitted to delegate "any of its duties and responsibilities, other than Trustee responsibilities." Mercy Health MyRetirement Personal Pension Account Plan, *Sanzone*, 326 F. Supp. 3d 795, ECF No. 150-8 at 55.

The court in *Smith* seems to *exclusively* focus on the plan documents in determining whether the Committees "maintained" the plans at issue. 349 F. Supp. 3d at

737, 743. The documents gave powers and responsibilities—including determining benefit eligibility, claims administration, plan interpretation, and rulemaking—to the at-issue committees. *Id.* (discussing OSF Healthcare's two defined-benefits plans, one for St. Francis employees and one for St. Anthony employees, and the respective plan committees); *see also* The Sisters of the Third Order of St. Francis Employees Pension Plan, *Smith*, 349 F. Supp. 3d 733, ECF No. 153-1; Retirement Plan for Employees of Saint Anthony's Health Center, *Smith*, 349 F. Supp. 3d 733, ECF No. 153-2. In fact, the *Smith* court specifically noted that the structure of the committees and the formal provision of powers and responsibilities to said committees is more important than the actual functioning of the committees for the sake of determining which organization is "maintaining" the plan. *Smith*, 349 F. Supp. 3d. at 743 n.4 ("[T]he question is not whether the Plan Committees are doing their jobs well or excessively delegating their authority, but rather whether the structure satisfies the requirements of the church plan definition."). The plan documents in *Smith* also appear to give the committees some ability to delegate. *See* The Sisters of the Third Order of St. Francis Employees Pension Plan, *Smith*, 349 F. Supp. 3d 733, ECF No. 153-1 at 65-66 ("The Plan Administrator . . . may appoint counsel, specialists, advisers, agents and other persons as the Plan Administrator deems necessary or desirable in connection with the administration of this Plan."), Retirement Plan for Employees of Saint Anthony's Health Center, *Smith*, 349 F. Supp. 3d 733, ECF No. 153-2 at 51-52 ("The Retirement Committee shall . . . appoint or employee individuals to assist in the administration of the Plan and any other agents it deems advisable, including legal and actuarial counsel.").

As a whole, these cases show that internal-benefits committees can "maintain" plans. *Medina I*, 877 F.3d at 1214, 1227 ("We see no reason to . . . require principal-purpose organizations to be organizations independent of the parent entity, endowed with the power to terminate benefit plans. No authority compels us to bar organizations from constituting subsidiary committees to administer their church plans."); *see also Smith*, 349 F. Supp. 3d at 738-39, 744; *Sanzone*, 326 F. Supp. 3d at 799, 808. A review of relevant plan documents in those cases suggest that internal-benefit committees may have a variety of powers and responsibilities, including the power to delegate responsibilities, and still be found to be "maintaining" a benefits plan. *See supra.* Further, the opinions taken together seem to indicate that a determination of which organization maintains a plan can rely heavily on the formal plan documents—documents which share many similarities with the St. Elizabeth Plan Document—and downplay the actual day-to-day functioning or activities of the organization. *See supra*.

Having considered the limited relevant case law, the Court now turns to whether the Committee here can be said to be "maintaining" the at-issue Plan. The Court finds that, based on the guidance from other courts and common sense, the Committee is "maintaining" the Plan. As the courts before this one have done, this Court will focus on the structure, purpose, and responsibilities of the Committee as set out by the Plan document rather than dive into the ocean of disputed facts about what the Committee actually does. *See Smith*, 349 F. Supp. 3d at 743 n.4.[10]

---

[10]     This approach is also consistent with the plain language of the church-plan exemption which states that the organization "maintain[ing]" must have a "principal purpose" *or* "function" of "administration or funding." 29 U.S.C. § 1002(33)(C)(i).

It is undisputed that the Committee was created through a Resolution by the Board of St. Elizabeth. (Doc. # 129-2). Section VII of the Plan document indicates that the purpose of the Committee shall be "to manage and administer the Plan . . . [as] the plan administrator and the named fiduciary." (Doc. # 132-3 at 41). As part of its role, the Committee has "the power and duty to do all things necessary or convenient to effect the intent and purposes of this Plan." *Id.* Specifically, the Committee is responsible for claims administration (including appeals), developing rules and regulations for Plan administration, interpreting the Plan, correcting the Plan as necessary, answering questions about the Plan, and establishing a policy to fund the Plan. *Id.* at 41-43. In other words, the Committee has responsibilities which ensure continuation of the Plan. *See Maintain*, BLACK'S LAW DICTIONARY (11th ed. 2019). The Committee is also permitted to delegate authority to other parties and act through agents or representatives; further, according to the Plan, any actions and determinations made by the Committee "shall be final and conclusive for all purposes of the Plan and Trust Agreement." (Doc. # 132-3 at 42-43).

The Plan document here indicates that the Committee has similar responsibilities to the committees in *Medina*, *Smith*, and *Sanzone*. *See supra*. In fact, the plan documents in the three analogous cases share many similarities with the St. Elizabeth Plan document. *Compare, e.g.*, (Doc # 132-3 at 41-44) (Article VII of the Plan document) *with* Catholic Health Initiatives Retirement Plan, *Medina II*, 147 F. Supp. 3d 1190 (D. Colo. 2015), ECF No. 303-1 at 45-49 (indicating that, *inter alia*, the Plan Administrator, known as the Retirement Committee, has "sole responsibility for the administration of the [Medina] Plan"; the Committee appoints, removes, and replaces Investment Managers;

the Committee is to act by majority agreement but may authorize one person to execute documents; the powers and duties include making rules for the plan, interpreting the plan, determining benefits under the plan, and appointing people or organizations to assist with plan administration). The courts in *Smith* and *Sanzone* each found that a combination of responsibilities designated to an internal committee by the plan document—such as determination of coverage, claims administration, plan interpretation, and oversight—to be sufficient to determine that the organization is "maintaining" the plan.[11] *Smith*, 349 F. Supp. 3d at 743; *Sanzone*, 326 F. Supp. 3d at 804. Additionally, all three courts were not bothered by the fact that the plan documents in each case allowed for some delegation of responsibilities by the internal committee. *See supra.* Following the guidance of these courts, and based on the Plan documents, this Court concludes that the Committee "maintains" the St. Elizabeth Plan for purposes of the church-plan exemption.

Plaintiffs argue that the Committee is not "maintaining"[12] the Plan, however, because the Committee plays a "[n]ominal [r]ole in [p]lan [a]dministration," and that "maintenance" requires more than mere "administration."[13] (Doc. # 137 at 8-11). While

[11] As the *Medina* district court found there was "no serious dispute that the principal purpose of the [defined-benefit] Plan Subcommittee is to administer the Plan," *Medina II,* 147 F. Supp. 3d at 1200, and the Circuit Court found that the power to "maintain" the plan was specifically delegated to the subcommittee, neither delved into the specific responsibilities of the subcommittee that indicated it was indeed maintaining that plan. *Medina I*, 877 F.3d at 1226.

[12] Plaintiffs cite to cases appearing to consider the meaning of "maintain" in other parts of ERISA. *See, e.g.*, (Doc. # 137 at 9-10) (citing, among others, *Williams v. WCI Steel Co., Inc.*, 170 F.3d 598 (6th Cir. 1999), *Thompson v. Am. Home Assur. Co.*, 95 F.3d 429 (6th Cir. 1996), *Hanshaw v. Life Ins. Co. of N. Am.*, No. 3:14-CV-216-JHM, 2014 WL 5439253 (W.D. Ky. Oct. 24, 2014), and *Carter v. Guardian Life Ins. Co. of Am.*, No. 7:11-cv-3-ART, 2011 WL 1884625 (E.D. Ky. May 18, 2011)). Aside from not dealing with the definition of "maintain" in relation to the church-plan exemption from ERISA, the cited cases do not appear to provide specific definitions of the word "maintain," *see, e.g.*, *Williams*, 170 F.3d 598, as *Medina* and others have done. *See Medina I*, 877 F.3d at 1225. Therefore, the cases cited by Plaintiffs are less instructive in determining the meaning of "maintain" as it relates to the church-plan exemption.

[13] Plaintiffs also argue that the Court should consider which of the multiple organizations caring for the plan have the primary responsibility and liability, pursuant to dicta in *Stapleton*. *See, e.g.*, (Doc. # 131 at 6, 20-21). As noted in in footnote 8 *supra*, however, the Court will not rely on *Stapleton*, as the Supreme

the Court agrees with Plaintiffs' premise that "maintenance" requires more than just "funding" or "administering," see *supra*, it finds that the Committee is doing more than mere "administration."  As the word "administer" is not defined in ERISA, the Court again must consider the ordinary meaning of the word and look to common dictionary definitions.  *Smith*, 508 U.S. at 228.  Black's defines the term "administer" as "to manage (work or money) for a business or organization."  *Administer*, BLACK'S LAW DICTIONARY (11th ed. 2019).  Similarly, the Oxford English Dictionary most relevantly defines "administer" as "to carry out or oversee the tasks necessary for the running of (an organization) or the effecting of (a state of affairs)."  *Administer*, Oxford English Dictionary (3d ed. 2011).  In this case, "administration" includes carrying out and overseeing activities necessary for the running of the Plan.

In light of these definitions, the Court finds "maintenance" and "administration" to be distinct actions.  The Court sees "administration" as the steps taken to actually run the Plan—in other words, for example, the work necessary to evaluate and pay out benefits claims.  On the other hand, the Court finds "maintenance" to be a broader term—one that encompasses all actions necessary to ensure the ongoing continuation of the benefits Plan.  While "maintenance" may include administrative functions—like claims administration—it also includes other actions necessary for long-term viability of a plan like interpreting and amending the plan and developing funding policies, which the Committee is also tasked with.  (Doc. # 132-3 at 41-43).  Thus, the Court finds that the Committee is undertaking more than mere "administration."

_____

Court specifically indicated that its decision did not provide any guidance about determining the scope of a principal-purpose organization.

In reviewing the record before the Court, however, it is clear that the Committee does not undertake on its own all of the responsibilities included in the Plan document. For example, claims administration is handled by Transamerica, a third party, *see* (Doc. # 128 at 72:1-9) (Marianne Tait, the System Director of Total Rewards at St. Elizabeth, indicating during her deposition that employees ready to retire work with Transamerica to complete the necessary paperwork), and the Committee meets only a few times per year for a couple of hours. *See, e.g.*, (Doc. # 129-7) (list of Committee meeting minutes and minutes from August 22, 2018 indicating the meeting lasted from 6:00 p.m. to 7:05 p.m.); (Doc. # 129-8) (meeting minutes from July 23, 2013 indicating the meeting lasted from 6:00 p.m. to 8:04 p.m.).

These undisputed facts, however, do not change the Court's conclusion that the Committee continues to "maintain" the Plan. Like in *Smith*, where the court disregarded Plaintiffs' contention "that the Plan Committees do not actually 'maintain' the Plans, because the minutes appear to show that they meet infrequently and briefly," the Court is to look at the form and structure of the Committee, rather than whether the Committee as a whole is itself carrying out its duties. *Smith*, 349 F. Supp. 3d at 743 n.4. Additionally, each plan in the discussed cases included some provision for delegation of responsibilities, which did not preclude findings that each internal committee "maintained" the respective plans. The Sisters of the Third Order of St. Francis Employees Pension Plan, *Smith*, 349 F. Supp. 3d 733, ECF No. 153-1 at 65-66; Retirement Plan for Employees of Saint Anthony's Health Center, *Smith*, 349 F. Supp. 3d 733, ECF No. 153-2 at 51-52; Mercy Health MyRetirement Personal Pension Account Plan, *Sanzone*, 326

F. Supp. 3d 795, ECF No. 150-8 at 55; Catholic Health Initiatives Retirement Plan, *Medina II*, 147 F. Supp. 3d 1190, ECF No. 303-1 at 47.

Further, *Medina* encourages a commonsense approach to the issue of "maintenance," *Medina I*, 877 F.3d at 1226-27, and the Court finds this approach persuasive. For the purposes of illustration, imagine if the undersigned and two other district judges were tasked with maintaining a recently developed law library for the Eastern District of Kentucky. Responsibilities in order to "maintain" the library might include developing library policies and processes to track library materials, ensuring the library remains organized so materials are easily located, updating library materials including purchasing the newest editions of materials, dealing with lost materials, helping other judges and their law clerks navigate the library, etc. As all three judges have responsibilities beyond maintaining the library, it would be reasonable to expect that they would delegate some or all of these tasks to, perhaps, full-time librarians to undertake day-to-day operations of the library while maintaining oversight over the library operations. Additionally, it would not be unreasonable for the undersigned to undertake certain tasks on his own—for example, purchasing new editions of the Bluebook—on behalf of the library.

In such a situation the librarians would be undertaking certain administrative tasks—day-to-day re-shelving of books, finding materials, and sending materials to the judges or law clerks that requested them, etc. The judges, on the other hand, are still overseeing the library as a whole and "car[ing] for [the library] for purposes of operational productivity," *Maintain*, BLACK'S LAW DICTIONARY (11th ed. 2019); thus, the judges would still be maintaining the library. Taking a commonsense approach to the concept of

maintenance, judges delegating tasks to a full-time librarian and allowing one judge to complete tasks on behalf of the library does not change the fact that all three judges are maintaining the library.

The Court must also take a commonsense approach to classifying the at-issue Committee. An ordinary understanding of "maintenance" suggests that the delegation of tasks to other entities, and the allowance of agents to carry out certain work, does not prevent the Committee as a whole from "maintaining" the Plan. Additionally, interpreting the statute as Plaintiffs suggest "would only allow the [church-plan] exemption for wholly independent bodies, constituted with the principal purpose of administering or funding a retirement plan, and endowed with the power to modify or terminate that plan." *Medina I,* 877 F.3d at 1226. As the Tenth Circuit noted, "[t]here may be some organization out there that is structured like that, but it certainly is not the most intuitive way to do it. And it is not clear what the advantage of such a structure would be, or why Congress would have required it." *Id.* at 1227. Accordingly, the Court finds that the Committee is an organization "maintaining" the Plan.

Defendants have conceded that two organizations "maintain" the Plan—St. Elizabeth and the Committee. (Doc. # 128 at 85) (Marianne Tait, the System Director of Total Rewards at St. Elizabeth, indicating during her deposition that "St. Elizabeth . . . maintains the plan, but so does the Pension Committee"). Plaintiffs argue that such a conclusion is inconsistent with the language of the church-plan exemption which indicates that a principal-purpose organization is "an organization." (Doc. # 131 at 20) (emphasis omitted). Plaintiffs claim that the use of "an," as well as the "primary responsibility" language from *Stapleton* suggest that only one organization can be found to "maintain"

the Plan and, thus, the Court must identify only one organization that is doing so.  *Id.* at 20-21.

Plaintiffs, however, fail to point to any binding case law (the Court has previously indicated that the language from *Stapleton* is not applicable) suggesting that a plan must be maintained exclusively by one organization.  *Id*.  Additionally, nothing in the text of the exemption suggests that the Plan must be exclusively maintained by only one organization.  *See* 29 U.S.C. § 1002(33)(C)(i).  Had the drafters of the statute and exemption intended to suggest that one and only one organization could "maintain" the plan, they could have included more specific language.  However, they did not do so.

In fact, the church-plan exemption seems to suggest that more than one organization may "maintain" a plan.  The construction of the statute indicates that "maintenance" means more than "administration" or "funding" combined, *see supra*, and seems to acknowledge the necessity of both to the viability of a plan.  *See* 29 U.S.C. § 1002(33)(C)(i).  A principal-purpose organization, however, need only perform one of those critical functions—"administration" *or* "funding."  As both are obviously necessary to have a successful pension plan, more than one organization could potentially be found to be "maintaining" the plan.  As the plaintiffs have failed to point to any cases suggesting otherwise and without further guidance, the Court finds that more than one organization can "maintain" a church plan.

### c.  Whether the Committee is a Principal-Purpose Organization

Now that the Court has determined that the Committee is indeed maintaining the Plan, it must finally determine whether the Committee is a principal-purpose organization. The language of the exemption indicates that a principal-purpose organization is an

"organization" with the "principal purpose" or "function" of "administering" or "funding" a retirement-benefits plan. 29 U.S.C. § 1002(33)(C)(i). The Defendants admit that the Committee does not fund the plan, (Doc. # 129-1 at 34) (quoting Doc. # 128 at 84), but the Court does find that the Committee's principal purpose is "administration" of the Plan.

While the Supreme Court has summarized the exemption language with the term "principal-purpose organization," it is important to note that the statutory language is broad and allows an exemption for an organization with the "principal purpose" *or* "function" of "administration" *or* "funding." 29 U.S.C. § 1002(33)(C)(i). In other words, either the "objective, goal, or end" of the organization *or* the "activit[ies] that [are] appropriate" for the organization, must be "administration" or "funding." *Purpose, Function*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "purpose" as "[a]n objective, goal, or end; specif., the business activity that a corporation is chartered to engage in" and "function" as an "[a]ctivity that is appropriate to a particular business or profession").

Looking to the Plan documents, as the Court did in determining whether the Committee "maintains" the Plan, the Court concludes that the Committee's principal purpose is "administration." The Plan document itself indicates that the objective and goal of the of the Committee is to "manage and administer the Plan." (Doc. # 132-3 at 41). The Resolution creating the Committee indicates the same—that the objective of the Committee is to "administer" the Plan. (Doc. # 129-2). The Resolution and the Plan Document are the relevant documents which lay out the "objective, goal, [and] end" of the Committee—in other words, they define the Committee's purpose. *Purpose*, BLACK'S LAW DICTIONARY (11th ed. 2019). As the purpose of the Committee, according to the documents, is "administration," and the Committee is "maintaining" the Plan, *see supra*,

the Committee clearly falls within the definition of a principal-purpose organization. While Plaintiffs argue that the Committee does not actually undertake administrative activities—as those activities have been delegated to Transamerica and others—this does not change the Court's conclusion. While the day-to-day activities of the Committee may go toward the Committee's principal *function*, it is undisputable that the principal *purpose* of the Committee is administration. Accordingly, the Court finds that the Committee is a principal-purpose organization that is maintaining the Committee, and there is no genuine dispute of material fact that the second prong of the *Medina* test is satisfied.

### 4. Inquiry 3—Is the principal-purpose organization associated with a church?

The last inquiry from the *Medina* test requires the Court to determine if the principal-purpose organization is associated with a church. *Medina* found that "a subdivision wholly encompassed by a larger entity shares that entity's affiliations." *Medina I,* 877 F.3d at 1227. In that case, because Catholic Health Initiatives was found to be associated with the Catholic Church, the principal-purpose organization (a subcommittee) which is "a subdivision of [Catholic Health Initiatives]" was associated with the Catholic Church as well. *Id.* That court reached this conclusion by looking both at how the principal-purpose organization was structured in relation to the larger organization, and also the obvious connections between the subcommittee and the Catholic Church. *Id.* For example, the plan documents indicated that the subcommittee should be "mindful of the . . . teachings and tenets of the Roman Catholic Church." *Id.* (internal quotations omitted) (quoting the record before the Tenth Circuit). Similarly, in *Sanzone*, that court found that because Mercy Health was associated with the church, the internal-benefits committee—"an internal subset of Mercy Health"—must also be.

*Sanzone*, 326 F. Supp. 3d at 807. *Smith* considered the structure and the committees' association with the Catholic Church and came to the same conclusion. *Smith*, 349 F. Supp. 3d at 743-744.

As the Court previously found that St. Elizabeth is associated with the Catholic Church, and the Committee is an "internal subset" of St. Elizabeth, the Court also finds that the Committee is associated with the Catholic Church and therefore satisfies the third prong of the *Medina* test. *Sanzone*, 326 F. Supp. 3d at 807; *see also Medina I,* 877 F.3d at 1227. This conclusion is also supported by Plan documents governing the Committee. For example, according to the Plan, "[t]he Committee shall consist of not fewer than three (3) members who believe in and follow the tenets of the Catholic Church." (Doc. # 132-3 at 41). Additionally, the Resolution creating the Committee indicated its role to "administer the St. Elizabeth Medical Center Employees' Penson Plan in a manner consistent with the tenets of the Catholic Church." (Doc. # 129-2). Following logical reasoning and looking at the Plan documents, there is no genuine issue of material fact that the Committee is also associated with the Catholic Church.

As all three inquiries of the *Medina* three-part test are answered in the affirmative—St. Elizabeth is associated with a church, the Committee is a principal-purpose organization and is maintaining the Plan, and the Committee is associated with a church—the Court finds that the Plan at issue meets the requirements for the church-plan exemption under ERISA.[14] Accordingly, as the requirements of ERISA do not apply to

---

[14] It could be argued that the church-plan exemption of ERISA has a fourth requirement. The language of the church-plan exemption requires that the principal-purpose organization be funding or administering a pension plan "for the employees of a church or a convention or association of churches." 29 U.S.C. § 1002(33)(C)(i). "[F]or purposes of the church-plan definition, an 'employee of a church' would include an employee of a church-affiliated organization (like the hospitals here)." *Stapleton*, 137 S. Ct at 1656 (citing 29 U.S.C. § 1002(33)(C)(ii)(II)). Thus, if a court were to consider this language to be a fourth requirement of the church-plan exemption, the requirements for the exemption would still be met.

St. Elizabeth's Plan, Defendants' Motion for Partial Summary Judgment shall be **granted**, and Plaintiff's Motion for Summary Judgment shall be **denied**. As the Court has found that ERISA does not apply to the at-issue church plan, it must dismiss claims one through five—claims brought by the Plaintiffs under ERISA. (Doc. # 74 at 20-26).

## III.    REMAINING CLAIMS

As discussed *supra*, because the Court has found that ERISA does not apply to the Plan, Plaintiffs' claims against St. Elizabeth under ERISA (claims one through five), must be dismissed. (Doc. # 74 at 20-26). This leaves two claims—a breach-of-fiduciary-duty claim and a breach-of-contract claim, both under Kentucky common law—before the Court. *Id.* at 26-28. The Court had original jurisdiction over the ERISA claims in this action as the claims raised a federal question "arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331. The Court maintained supplemental jurisdiction over the remaining state-law claims as "they form[ed] part of the same case or controversy." 28 U.S.C. § 1367(a).

A district court, however, "may decline to exercise supplemental jurisdiction over [such a claim] if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Specifically, "[a] district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). "As a rule of thumb, when all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Id.* at 1254-55.; *see also Artis v. District of Columbia*, 138 S. Ct 594, 597-98 (2018) ("When district courts dismiss all claims independently qualifying

for the exercise of federal jurisdiction, they ordinarily dismiss as well all related state claims."). "If a district court declines to exercise jurisdiction over a [supplemental jurisdiction] claim . . . and the plaintiff wishes to continue pursuing it, she must refile the claim in state court." *Artis*, 138 S. Ct. at 599. In order to ensure a plaintiff's ability to refile, the state statute of limitations is tolled during the pendency of the federal litigation. *Id.* at 598-99, 603 ("[T]he limitations clock stops the day the claim is filed in federal court and, 30 days post dismissal, restarts from the point at which it had stopped.").

As this action is still in the pretrial stages, the focus of litigation to this point has been not on the state-law claims but on whether ERISA governed the Plan, and the Court has dismissed the claims upon which the Court had original jurisdiction, the Court now declines to exercise supplemental jurisdiction over the remaining two claims. Accordingly, the remaining two claims will also be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c). Plaintiffs may refile these claims in the appropriate state court.

## IV.    CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Defendants' Motion for Partial Summary Judgment (Doc. # 129) is **GRANTED**;

(2)    Plaintiffs' Motion for Summary Judgment (Doc. # 130) is **DENIED**;

(3)    Plaintiffs' ERISA claims (claims one through five) are **DISMISSED WITH PREJUDICE**;

(4)    Plaintiffs' remaining Kentucky state-law claims (claims six and seven) are **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. 1367(c)(3);

(5)    This matter is hereby **STRICKEN** from the Court's active docket; and

(6)    A Judgment will be entered contemporaneously herewith.

This 25th day of July, 2019.



Signed By:
*David L. Bunning*
United States District Judge

K:\DATA\ORDERS\Cov2016\16-49 MOO on Church Plan Issue .docx